1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW GARCIA,<br><br>            **Petitioner,**<br><br>v.<br><br>M.S. EVANS,<br><br>            **Respondent.** | No. CV 07-02316 CBM (HCx)<br><br>**ORDER DENYING PETITIONER'S WRIT FOR HABEAS CORPUS** |

The matters before the Court[1] are California state prisoner Andrew Garcia's Amended Petition[2] for a Writ for Habeas Corpus, filed on November 19, 2007, (hereinafter, "the Amended Petition"), challenging his state conviction and sentence on due process grounds. The Court **DENIES the Amended Petition and DISMISSES it with prejudice.**

//

//

---

[1] The Honorable Consuelo B. Marshall of the Central District of California sitting by designation. [Docket No. 27.]
[2] Petitioner filed a Petition for a writ for habeas corpus on October 29, 2007, and then an Amended Petition on November 19, 2007. [Docket Nos. 1, 5.] The Court has reviewed and compared the November 19, 2007, Amended Petition to the original October 29, 2007, Petition and has found no substantive differences between the two documents. The Court construes the Amended Petition as superseding and replacing the October 29, 2007, Petition.

# BACKGROUND

This Amended Petition[3] arises out of Andrew Garcia's (hereinafter, "Petitioner") 2004 conviction following a jury trial for: (1) assault with personal use of firearm; (2) vehicle theft; (3) evading a police officer; (4) felon in possession of a firearm; (5) carrying a loaded firearm in a public place; and (6) resisting arrest, for which he was sentenced[4] to a total concurrent sentence of twenty three (23) years and eight (8) months.

## I.   Commitment Offense

### a.   The Events of November 15, 2003

On November 15, 2003, a man named David Dawson was at a party in Sacramento, where he met a woman named either "Shelese", "Sherlene" or "Sharlene" and a man named Toby. The woman and Toby gave Dawson a ride home from the party. When they arrived at Dawson's apartment, located at 2424 I Street, Dawson invited the duo in. Once inside, the woman and Toby told Dawson they were boyfriend/girlfriend. Toby left around 2:00 a.m.; the woman stayed behind at Dawson's apartment. When Dawson woke up the next day, the woman was still in his apartment. The woman asked Dawson for a ride home, which he declined to do, she wrote a note for Toby and departed in a cab.

### b.   The Events of November 16, 2003

The next day, November 16, 2003, Dawson was alone in his apartment on I Street when someone knocked on his front door. Dawson opened the door and saw a male he did not know standing there, holding a small chrome-plated, two barreled, snub-nosed .22 caliber pistol. The man had a goatee and was wearing a beanie or cap and a long sleeved yellow shirt and had a tattoo on his neck.

---

[3] This background section is based on the California Court of Appeals's review of the facts at trial. *See* California Court of Appeals's Decision, Lodged Document No. 4, at pp. 1-5.

[4] With respect to Petitioner's sentence, the trial court found that Petitioner had: (1) one strike for the purposes of California's Three Strike Law on account of a prior conviction of burglary in 1986; and (2) served three other prison terms for petty theft in 1991, escaping a penal institution in 1993, and receipt of stolen property in 1995.

The man accused Dawson of kidnapping his sister and holding her hostage for two days. He then stepped into the apartment, locked the door and raised the gun to Dawson's face. When Dawson replied that he didn't know what the man was talking about, the man slapped Dawson on the head. Dawson stumbled to the floor. The man told Dawson to get down on the ground but instead Dawson ran to the window, broke it, and screamed for help. The man then ran out the door and down the stairs.

Dawson went to his balcony and saw the man taking off his shirt as he was walking west down I Street. Once the man's shirt was off, Dawson could see that the man had tattoos shaped like wings on both sides of his back and shoulders. A bit later Dawson heard a car door slam and then start. Dawson saw the man drive away in a teal or green-blue hatchback Honda or Civic that had been parked across the street. Dawson then called the police.

Later that day, a Sacramento Police Officer attempted to pull over a teal Honda, driven by Petitioner, which had previously been reported as stolen. Petitioner did not pull over; a car chase ensued. At some point, Petitioner turned the Honda into an alleyway, got out and fled on foot. Petitioner was found hiding shortly thereafter and was taken into custody.

## II.    The Two Pre-Trial Photo Lineups

Dawson was shown a photo lineup two days after the incident, which included Petitioner's photo. Dawson selected two men from the lineup, stating that he was forty percent sure that the man in photo number two was his assailant and that he was sixty percent sure that the man in photo number one was his assailant.

Several months later, Dawson was shown another photo lineup. This time, he identified Petitioner as his assailant.

Dawson admitted at trial that reason he identified Petitioner as his assailant

was that he recognized Petitioner's picture from the first lineup.  Dawson said his selection was not based on any independent recollection of Petitioner as his assailant, but because he remembered seeing Petitioner's photo in the first lineup.

## III.   The Testimony And Evidence At Trial

Petitioner took off his shirt at trial and showed his back and tattoos to the jury.  Dawson testified that although Petitioner's tattoos were consistent with those he saw on his assailant, he was not sure they were the same tattoos his assailant had.  Dawson also testified that although Petitioner looked similar to his assailant, he was not certain whether Petitioner was the man who attacked him.

A woman named Sherish Baldarez testified at trial.[5]  Baldarez testified that she had only known Petitioner for about a week when, on November 16, 2003, he picked her and another woman up in a two-door green vehicle and drove them to 15th and I Street to talk to someone there.

Petitioner parked the car across the street from an apartment building. Baldarez saw Petitioner go to an upstairs apartment in the building across the street.  She then heard yelling and saw glass break. When Petitioner returned to the car, he asked her to start the vehicle.  Baldarez told the jury that she couldn't start the car, in part because she didn't know how to drive stick shift, and in part because the car would only start with a screwdriver, which she did not have.  She testified that Petitioner then ran down the street, taking his shirt off.

Baldarez testified that she thought, but was not sure, that Petitioner was wearing a blue shirt that day.  She also denied Petitioner was wearing a hat or cap.

Baldarez admitted that her boyfriend at the time was named Toby.  Toby was described as having blond-red hair.  Baldarez testified that Toby did not have any tattoos.

---

[5] Dawson was uncertain if Sherish Baldarez was the same woman who stayed at his house on November 15, 2003. Baldarez said she knew Dawson but denied being at his home on November 15, 2003. Her testimony was impeached by forensic evidence that she was the one who wrote the note to Toby and by testimony from a cab driver that he picked up a woman who looked like Baldarez near Dawson's apartment on November 15, 2003.

Another witness testified that she heard and saw Toby and Baldarez on November 16, 2003, asking people for a ride so they could go confront some man about his sexual advances towards Baldarez.

The jury also heard evidence that a small loaded handgun was retrieved from the Honda and that the fingerprints lifted from Dawson's apartment and the gun did not match Petitioner's fingerprints.

## IV.   Procedural History

Petitioner appealed his conviction and sentence. First, on September 9, 2005, Petitioner appealed his conviction and sentence to the California Court of Appeals, Third Appellate District. The court affirmed Petitioner's conviction and sentence on January 5, 2007. California Court of Appeals Decision, Lodged Document No. 4. Petitioner then filed a petition for review of the California Court of Appeals's decision with the California Supreme Court which was dismissed on September 12, 2007. Supreme Court Decisions, Lodged Documents Nos. 6 and 7.

Petitioner then filed the instant Amended Petition in this Court for habeas relief.

## PETITIONER'S GROUNDS FOR RELIEF

Petitioner contends he is entitled to habeas relief on the following grounds:

(1)   Petitioner was deprived of his rights to due process and a fair trial because the pretrial identification lineup shown to a key witness was impermissibly suggestive as a result of undue police influence.

(2)   The trial court's denial of Petitioner's Motion for New Trial based on juror misconduct in attempting to gain outside information from a police website in order to determine if tattoos are displayed on booking photos deprived Petitioner of a fair trial.

(3)   The imposition of an upper term sentence violated *Blakely* and Petitioner's federal constitutional rights to a jury[6] trial.

---

[6] In his Opening Brief, Petitioner stated that his direct, state court appeal included an ineffective assistance of counsel claim pursuant to the Federal Constitution's Sixth Amendment. Nowhere, however, in the instant federal Petition does he address how or why he was deprived of his Sixth Amendment right to counsel during trial. At most, Petitioner states in his Reply that "the trial court engaged in an unauthorized sentence in contravention of my Sixth Amendment right to a jury trial. Moreover, defense counsel, who should have been aware of the viable nature of this issue, should have objected." Petitioner's Traverse at p. 53.

## STANDARD OF REVIEW

An application for a writ for habeas corpus on behalf of a person in custody pursuant to a state court "judgment" "shall not be granted with respect to any ground adjudicated on the merits" in state court unless that "adjudication" either:

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[7] The phrase "clearly established law" refers to the "holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (citation omitted.)

A state court decision is "contrary to" the clearly established Supreme Court precedent if it: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or, (2) "confronts a set of facts that are materially indistinguishable from a decision of the [Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002). State court decisions that are not contrary to clearly established Supreme Court precedent warrant federal habeas relief "only if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or based on 'an

---

To obtain habeas relief for ineffective assistance of counsel, Petitioner must satisfy the two-pronged test promulgated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "First, [Petitioner] must demonstrate that counsel's performance was deficient and 'fell below an objective standard of reasonableness.'" *Hebner v. McGrath*, 543 F.3d 1133, 1137 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 688). "Second, [Petitioner] must establish prejudice by demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

Here, Petitioner failed to make any showing that his counsel's performance was less than reasonable or that he was prejudiced by his counsel's allegedly ineffective assistance. The Court of Appeals rejected Petitioner's ineffective assistance of counsel claim with respect to his lawyer's failure to object to the trial court's sentencing claim because the sentence was properly imposed. This Court agrees. Therefore the Petitioner's sentence was properly imposed and Petitioner's ineffective assistance of counsel claim is denied.

[7] State appellate court findings are normally entitled to a presumption of correctness. 28 U.S.C. § 2254(c)(1).

*unreasonable* determination of the facts.'" *Id.* at 11; *see also Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) (an unreasonable application of federal law is distinct from an incorrect application).

A state court decision is an "unreasonable application of" Supreme Court precedent if the court "correctly identifie[d] the governing legal rule but applie[d] it unreasonably to the facts" of the case. *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000)).

Moreover, even if the state court judgment is contrary to or an unreasonable application of federal law, habeas relief will generally not be granted if the error was harmless beyond a reasonable doubt. *Neder v. U.S.*, 527 U.S. 1, 15 (1999); *Chapman v. Cal.*, 386 U.S. 18, 24 (1967). The relevant test for habeas review is whether, based on the whole record, the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. U.S.*, 328 U.S. 750, 776 (1946); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Neder*, 527 U.S. at 15, 19. The reviewing court must therefore ask itself, "is it clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent the error?" *Id.* at 18. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on a trial error unless they can establish that it resulted in "actual prejudice." *See U.S. v. Lane*, 474 U.S. 438, 449 (1986).

A reviewing federal court may "look through" "subsequent unexplained orders" to the last reasoned state court judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Here, that is the California Court of Appeals's decision affirming Petitioner's conviction and sentence.

## DISCUSSION

The gravamen of Petitioner's writ for habeas corpus is that his trial and sentence deprived him of due process of law and a fair trial. Petitioner advances

three reasons why his conviction and sentence violate due process: (1) the photograph lineup was impermissibly suggestive; (2) the trial court failed to grant him a new trial after at least one juror admitted that he tried to gain access to extrinsic evidence; and (3) the trial court imposed an "upper term" sentence without submitting aggravating factors to the jury.

The Court addresses each argument in turn, below, and concludes that the California Court of Appeals's decision upholding Petitioner's conviction and sentence was neither contrary to, nor involved an unreasonable application of, clearly established Federal law as determined by the United States Supreme Court.

## I. Improper Lineup

First, Petitioner argues that the admission of Dawson's out-of-court identification of Petitioner from a second photo lineup deprived Petitioner of due process of law pursuant to the Fourteenth Amendment of the Constitution.

The constitutional question here is whether the circumstances of the out-of-court identification process were so conducive to an irreparable misidentification that Petitioner was deprived of due process. For the reasons stated below, the California Court of Appeals's finding that Dawson's identification was admissible was a reasonable application of law.

### a. Legal Standard

A suspect does not have a constitutional right to a perfect lineup. *See Manson v. Brathwaite*, 432 U.S. 98, 104 (1976). Instead, a suspect has a due process right to be free from a lineup that "[i]s so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. U.S.*, 390 U.S. 377, 384 (1968).

The constitutionality of identification procedures such as lineups involves a two-step test, measured by the totality of the circumstances. *See id.* First, the court must determine whether the identification procedure was impermissibly

8

suggestive and conducive to misidentification.  Even if the procedure was impermissibly suggestive, an identification procedure that is nonetheless reliable can be admitted without violating due process.  *See id.*; *see also Mason*, 432 U.S. at 106.

### 1.    *Impermissibly Suggestive Line Up*

With respect to the first step of the analysis, an identification procedure is impermissibly suggestive when the police conduct it in such a way that the witness's attention is directed to a particular individual whom the police suspect is the culprit.  *See U.S. v. Wade*, 388 U.S. 218, 233 (1967).  For example, the "practice of showing suspects singly to persons for the purpose of identification and not part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967); *see also Foster v. Cal.*, 394 U.S. 440, 443 (1969) ("The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify petitioner whether or not he was in fact 'the man.'"). Pursuant to this standard, suggestive identifications may include, *inter alia*, lineups where the identifying witness knew everyone in the lineup but the suspect; lineups where all the participants in the lineup looked grossly dissimilar to the suspect; lineups where only the suspect was required to wear distinctive clothing; and lineups where the participants in the lineup were asked to try on clothing that fit only the suspect.  *See U.S. v. Wade*, 388 U.S. at 233.

### 2.    *Reliability Of Identification*

Next, if the identification procedure was impermissibly suggestive, the court must consider whether under the totality of the circumstances the identification was nonetheless reliable.  The following factors are considered in determining the reliability of the witness's identification:

(1)    the opportunity of the witness to view the criminal at the time of the crime;
(2)    the witness's degree of attention;
(3)    the accuracy of the witness's prior description of the criminal;

(4)   the level of certainty demonstrated by the witness at the confrontation; and
(5)   the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *U.S. v. Simoy*, 998 F.2d 751, 752 (9th Cir. 1993).  If the identification is reliable, it may be admitted despite its suggestiveness. *See Mason*, 432 U.S. at 106.

Such was the case in *Neil v. Biggers*, 409 U.S. 188.  There, a rape victim spent considerable amount of time with her attacker during the crime, faced him directly and "intimately" in adequate lighting and her description of him before being exposed to the suggestive identification procedure was detailed. *See id.* at 200.  The Supreme Court held that the victim's identification was, under the totality of the circumstances, reliable even though the identification procedure was suggestive. *See id.*  Therefore, identification evidence should not be excluded on due process grounds unless the identification procedure *was* both impermissibly suggestive and unreliable. *See Foster*, 394 U.S. at 443 (suggestive identification procedure so undermined the reliability of the identification that inclusion of identification violated suspect's due process).

### 3.   *Harmless Error*

Despite the foregoing, a conviction will not be set aside on account of an impermissibly suggestive and unreliable lineup if the admission of that lineup evidence was nothing more than harmless error. *See U.S. v. Wade*, 388 U.S. at 242; *see also Gilbert v. Cal.*, 388 U.S. 263, 272 (1967); *see Manson*, 432 U.S. at 109.  The Supreme Court in *Mason* opined that "short of irreparable misidentification" "such evidence is for the jury to weigh. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." *Id.* at 116.  Accordingly, the fact that an identification procedure is merely unreliable is insufficient because "the defect, if there be one, goes to weight and not to substance." *Id.* at 117.  Instead, the true test is whether the identification procedure gave rise to a substantial

likelihood of an *irreparable misidentification* that cannot be cured or otherwise explained to the jury.

### b. Analysis

Petitioner contends that the admission of Dawson's pre-trial identification of him from the second photo lineup followed by Dawson's in trial identification of him violated his right to due process because Dawson admitted that he recognized Petitioner from the first lineup.

The California Court of Appeals rejected[8] Petitioner's argument on the grounds that the lineup evidence was harmless. The court decided that the "weakness of the [lineup] evidence rendered [its] admission harmless beyond a reasonable doubt." California Court of Appeals Decision at p. 7. This finding was reinforced by the other evidence linking Petitioner to the scene of the crime such as: (1) Baldarez's testimony that she drove with Petitioner to a location that matched the description of Dawson's apartment building on the day of he incident, saw Petitioner go to an upstairs apartment and later saw him running down the street taking off his shirt, and (2) Dawson's testimony to the same effect, including testimony that his assailant had tattoos consistent with Petitioner's. The jury knew[9] the flaws in the lineup evidence and was able to assign it the appropriate weight. The defects in the identification procedure went to the weight, not the admissibility of the evidence such that any potential error by the trial court was harmless and did not prejudice Petitioner. *See Gilbert*, 388 U.S. at 272; *see Kotteakos*, 328 U.S. at 776. Accordingly the lineup evidence did not create a substantial risk of irreparable misidentification and the California Court of Appeals's finding that the lineup evidence was properly admitted was not an

---

[8] In California, the test for the constitutionality of identification procedures mirrors the federal test. *See People v. Blair*, 25 Cal.3d 640, 659 (1979) quoting *Simmons v. U.S.*, 390 U.S. at 384. Like its federal counterpart, California applies the harmless error standard with respect to the constitutionality of identification procedures.

[9] Indeed, in closing arguments, the prosecutor acknowledged that Dawson had not been able to positively identify Petitioner as his assailant and presented other evidence incriminating Petitioner. The prosecutor "urged the jury to convict [Petitioner] despite the identifications." Court of Appeals Decision at 9.

unreasonable application of federal law.

## II.   Juror Misconduct

Next, Petitioner contends that the trial court's failure to declare a mistrial upon learning that at least one juror tried to acquire extrinsic evidence deprived him of a fair trial.  For the reasons, below, the California Court of Appeals's decision upholding the trial court's denial of Petitioner's motion for a new trial was not contrary to, or an unreasonable application of, federal law.

### a. Legal Standard

The Sixth Amendment's guarantee of a trial by jury requires that a verdict be based on evidence produced at trial.  A longstanding principle of federal law is that the jury's exposure to facts not in evidence deprives a criminal defendant of his constitutional right to confrontation, cross-examination and assistance of counsel. *See Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008); *see also Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000).

#### 1.   *Effect Of Misconduct On The Verdict*

Although jurors have a duty to consider only evidence admitted by the court, *see Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986), not every act of juror misconduct requires a new trial.  *See U.S. v. Hendrix*, 549 F.2d 1225, 1229 (9th Cir.), cert. denied, 434 U.S. 818 (1977).  Instead, once a juror "has breached [his] duty by infecting the deliberations with extrinsic material, a new trial is warranted if there is a 'reasonable possibility'" that the infusion of extrinsic evidence into the deliberations affected the jury's verdict. *Bayramoglu*, 806 F.2d at 887; *see also Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995); *see also Sassounian*, 230 F.3d at 1108.

A conviction will be set aside only if it can be established that the jury's exposure to extrinsic evidence had a substantial and injurious effect on its verdict. *See id.*  To determine whether a juror's misconduct is harmless, courts consider

the following factors:

(1)   whether the material was actually received, and if so, how;
(2)   the length of time it was available to the jury;
(3)   the extent to which the juror discussed and considered it;
(4)   whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and
(5)   any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic materially affected the verdict.

*Lawson*, 60 F.3d at 612; *Sassounian*, 230 F.3d at 1108. Additional factors that "might nonetheless suggest that the potential prejudice of the extrinsic information was diminished in a particular case", *id.*, include:

(1)   whether the prejudicial statement was ambiguously phrased;
(2)   whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial;
(3)   whether a curative instruction was given or some other step taken to ameliorate the prejudice;
(4)   the trial context; and
(5)   whether the statement was insufficiently prejudicial given the issues and evidence in the case.

*Id.; see also Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997). Another indicator that the jury's verdict was influenced by extrinsic information occurs when lengthy deliberations precede the alleged juror misconduct but is quickly followed with a verdict. *See Sassounian*, 230 F.3d at 1110.

2.   *No Inquiry Into Subjective Effect Of Misconduct On Jury*

The foregoing notwithstanding, evidence of a juror's subjective thought process may not be used in determining whether the alleged juror misconduct affected the jury's verdict. Federal Rule of Evidence 606(b)[10] provides that:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about:

(1)   whether extraneous prejudicial information was improperly brought to the jury's attention;
(2)   whether any outside influence was improperly brought to bear upon

---

[10] The Supreme Court in *Estrada* found that a "ruling consonant with Federal Rule of Evidence 606(b) [is] not contrary to, or an unreasonable application of, clearly established Supreme Court law. 512 U.S. at 1237.

13

1
2
   (3)   any juror; or
whether there was a mistake in entering the verdict onto the verdict form.

3
4
A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

5 Fed. R. Evid. 606(b).[11]

6       Although evidence the jury considered extrinsic evidence may be

7 admissible to set aside or impeach a conviction, evidence of an individual juror's

8 "mental processes" or "subject thoughts" or "subject reasoning process" may not.

9 *See Estrada*, 512 F.3d at 1237; *see also Sassounian*, 230 F.3d at 1109. Pursuant

10 to Federal Rule of Evidence 606(b), the court can consider whether the improper

11 extrinsic evidence was before the jury but it cannot consider either the subjective

12 impact of that improperly admitted evidence either on the jury's verdict or on a

13 particular juror. *See id.*; *see Dickson v. Sullivan*, 849 F.2d 403, 406 (9th Cir.

14 1988) ("the question of prejudice is an objective, rather than a subjective, one").

15       b. <u>Analysis</u>

16       Here, it is undisputed that Juror #3 attempted to conduct independent

17 research and informed the other jurors of his attempt to learn outside information.

18 Specifically, Juror #3 sought to learn whether the Sacramento Police Department

19 includes photographs of a suspect's tattoos in his booking photos.[12]

20       1.    *Juror #3's Declaration*

21       One of Petitioner's defenses at trial was that Toby, not Petitioner,

22 committed this crime. At trial, both Petitioner's and Toby's booking photographs

23 were admitted. Petitioner's booking photos included tattoos. Toby's did not.

24       Juror #3 admitted in his declaration that when the jury first started

25

26
27
[11] Courts have acknowledged that Rule 606(b) creates a paradox: in seeking to determine the extent to which the juror misconduct affected jury's deliberations, courts must turn a blind eye to the most direct evidence of prejudice, namely the juror's own impressions and portrayal of the deliberations. *See Sassounian*, 230 F.3d at 1109.

28
[12] In his motion for a new trial, Petitioner submitted declarations from both Juror #3 and Juror #4 regarding Juror #3's alleged juror misconduct and its effect on the jury's verdict, which both the trial court and the California Court of Appeals considered in deciding whether Juror #3's misconduct affected the jury's verdict.

deliberating, he had some doubts about whether the crime was committed by Toby or Petitioner.  According to Juror #3, he was curious whether the absence of tattoos from Toby's booking meant that Toby did not have tattoos, or just that the police failed to include them in his booking photos.  Declaration of Juror #3 attached to Petitioner's Traverse.  If booking photographs included a suspect's tattoos, the jury could reject the idea of Toby being the culprit because Dawson was certain his assailant had tattoos.  *Id.*

Juror #3 declared that during the evening following the first day of deliberations, he logged onto the Sacramento Police Department website to try to determine whether the Department includes a suspect's tattoos in his booking photos.  Juror #3 could not find the answer to his question.  *Id.*  The next day, Juror #3 told the other members of the jury that he had tried to determine whether booking photos include tattoos, but was unsuccessful in locating this information.  Juror #3 stated in his declaration that he did not specifically tell the jury he had looked on the Sacramento Police Department's website.  *Id.*

According to Juror #3's declaration, another juror, whom he does not identify, then said that the police should include tattoos in booking shots because they are a means by which to identify people.  Ultimately, the jury "figured that tattoos would be included on the mug shots."  *Id.*

### 2.   *Juror #4's Declaration*

According to Juror #4, one of the jurors said on the morning of the second day of deliberations that "he found out that booking photos showed any and all tattoos . . . if the subject had any tattoos, there would be photographs of the tattoos on the booking photos."  Declaration of Juror #4 attached to Petitioner's Traverse.  Therefore, Juror #4 declared, "we looked at the booking photos of [Toby] and there was nothing on the booking photos indicating that he had tattoos . . . Once we concluded that tattoos were included in the booking photos, and that [Toby]

did not have tattoos, everyone clearly found [Petitioner] guilty." *Id.* The jury arrived at its verdict later that same day.

### 3. *California's Finding Of No Misconduct*

The trial court denied Petitioner's motion for new trial on the grounds that Juror #3 committed only attempted misconduct. Because no extrinsic evidence was actually obtained or used, or shared with the jury, Juror #3's conduct did not prejudice Petitioner. *See* California Court of Appeals's Decision at pp. 11-12.

The California Court of Appeals affirmed the trial court's ruling in part because evidence "evincing the juror's mental processes must be disregarded."[13] *Id.* at p. 13. Applying California Evidence Code section 1150, which is coextensive to Federal Rule of Evidence 606(b), the California Court of Appeals concluded, *inter alia*, that the juror's doubts as to whether Toby or Petitioner committed the crime, the weight the jury attached to the "tattoo evidence," and the significance of the evidence Juror #3 tried to obtain were all inadmissible. *Id.* Because Federal Rule of Evidence 606(b) prohibits evidence of a juror's motives, beliefs, and understandings, the California Court of Appeals's finding in this respect was neither contrary to nor an unreasonable application of federal law.

Applying Federal Rule of Evidence 606(b), the California Court of Appeals also found that that the jury didn't actually receive extrinsic evidence because Juror #3 was unable to obtain any outside information. Although the Ninth Circuit in *U.S. v. Bagnariol*, 806 F.2d 877 (9th Cir. 1981), reasoned that a juror's attempt to do independent research at a library did not affect the defendant's right to a fair trial, because there was "very little difference in the statements [the juror] could have offered had he not checked the library and those he actually made after the visit . . . [he] found in 15 minutes that [the information] did not exist," this Court would find the instant situation distinguishable. The information the juror in

---

[13] One Judge did write separately in dissent.

*Bagnariol* sought was immaterial to the ultimate issues in that case and the juror's attempt to perform independent research did not affect the verdict. The same cannot be said here: whether Toby was the culprit was material. Regardless of whether Juror #3 obtained the answer to his question, the fact that he told the jurors that he made an independent inquiry tainted the deliberations and directed the jury down a path it may not have otherwise gone.

The foregoing notwithstanding, this Court cannot hold that the California Court of Appeals's decision was an *unreasonable application* of federal law because *Bagnariol* empowers courts to consider whether the extrinsic evidence was actually received by the jury in determining whether the defendant has been deprived of a fair trial as a result of the juror's misconduct. *See Bagnariol*, 665 F.2d 877. Given the Ninth Circuit's decision in *Bagnariol*, the California Court of Appeals's finding that Juror #3 committed only attempted misconduct is not unreasonable, even if this Court would not have arrived at the same conclusion itself.

Moreover, where the evidence against a defendant is cumulative and overwhelming, a juror's misconduct cannot be said to have influenced the jury's determination of the defendant's guilt. *See id.*, 665 F.2d at 889. Here, the California Court of Appeals concluded that Petitioner was not prejudiced by Juror #3's misconduct because there was significant other evidence that could have supported the jury's verdict. According to the California Court of Appeals, the following circumstantial evidence could have been relied on by the jury to return a guilty verdict: (1) there was no evidence in the record that Toby had tattoos, regardless of what the booking photos show; (2) evidence that Toby is white and has blondish-red hair suggests that Toby does not look anything like the person Dawson described as his assailant, who Dawson said Petitioner resembled; (3) evidence that Petitioner was near the scene of the crime on the day of the incident

and fled the scene was also probative of his guilt.  California Court of Appeals Decision at pp. 17-18.  The California Court of Appeals finding that there was sufficient other evidence to convict Petitioner was a reasonable application of federal law and moots Petitioner's claim that Juror #3's misconduct affected the jury's verdict.

Given the foregoing, the California Court of Appeals's conclusion that there was on balance other evidence sufficient to convict Petitioner is neither contrary to nor an unreasonable application of federal law.

### III.   Upper Limit Sentence

Lastly, Petitioner argues that the trial court deprived him of due process when it imposed an upper limit sentence without submitting either the firearm sentence enhancement or the parolee at large sentence enhancement to the jury. Petitioner is incorrect.

### A.   Legal Standard

For constitutional purposes, there is no distinction between "sentencing factors" and elements of the crime.  *See Washington v. Recuenco*, 548 U.S. 212, 220 (2006) (sentencing factors and elements must be treated the same for Sixth Amendment purposes).  "Sentencing factors, like elements," must "be tried to the jury and proved beyond a reasonable doubt", *see id.*; *see also Apprendi v. N.J.*, 530 U.S. 466 at 483-484, and a trial court generally cannot impose an upper limit sentence on a defendant on account of facts not found by the jury.  *See Blakely v. Wash.*, 542 U.S. 296 (2004).  Consequently, sentence enhancing factors such as whether Petitioner used a firearm during the crime and whether he was on parole at the time of the crime must be proved to the jury beyond a reasonable doubt.  *See Recuenco*, 548 U.S. at 221.

Despite the constitutional violation inflicted by a trial court's failure to submit sentence enhancing factors to the jury, a conviction will not be set aside if

it was harmless. *See id.* at 219-221 (*Blakely* error not a structural constitutional error which requires automatic reversal); *see also Neder*, 527 U.S. at 8. The Supreme Court's decision in *Recuenco* is instructive: there, the court held that the trial court's unilateral imposition of the firearm sentence enhancement was proper, because the jury had found as one of the elements of the offense, that the defendant had used a deadly weapon to commit the crime. *See* 548 U.S. at 220-221. The court reasoned that the sentence was proper because the jury *would have* found the firearm sentencing enhancement true if it had been asked. *See id.*

Furthermore, an exception to the general rule that the jury must decide sentence enhancing factors occurs when the defendant has a prior criminal history. *See Blakely*, 542 U.S. at 301 "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *see also Apprendi*, 530 U.S. at 466. Indeed, the Supreme Court held in *Almendarez-Torres v. U.S.*, 523 U.S. 224, 231 (1998), that trial courts may increase a sentence based on a defendant's criminal history without submitting the fact of the defendant's recidivism to the jury. In so holding, the court noted that the "prior commission of a serious crime – is as typical a sentence enhancing factor as one might imagine." Therefore, a defendant's past convictions alone justify an upper limit sentence.

B.    Analysis

Here, the trial court sentenced Petitioner to an upper limit sentence because of his extensive prior criminal record. Reporter's Transcript on Appeal, Lodged Document No. 10 at pp. 604, 632. The *Blakely* line of cases permits the trial court to use Petitioner's previous criminal record to enhance his sentence to the statutory maximum without submitting this fact to the jury. *See Blakely*, 542 U.S. at 301; *Apprendi*, 530 U.S. at 466. Therefore, the California Court of Appeals's finding with respect to Petitioner's past criminal history that "one valid factor in

aggravation is sufficient to expose defendant to an upper term" is consistent with federal law.  California Court of Appeals Decision at p. 20.

The fact that the trial court did not submit either the firearm sentence enhancement or the parolee at large sentence enhancement factor[14] to the jury is irrelevant in light of the fact that the trial court had the discretion to impose an upper term sentence on account of Petitioner's criminal history.  The judge could have imposed a statutory maximum sentence even if the jury found the firearm enhancement to be false.  *See Blakely*, 542 U.S. 296, 301 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

Furthermore, that the jury already found Petitioner had used a firearm, as an element of the underlying offense, is significant.  Use of a firearm can be both an element of a crime and a sentence enhancing factor.  *See Recuenco*, 548 U.S. at 220-221. A jury's verdict convicting a defendant of a crime in which use of a firearm is an essential element also answers the firearm sentencing factor question because the two inquiries are the same: did the defendant use a firearm.  Accordingly, the trial court's error, if any, was harmless and the California Court of Appeals's finding that the "sentence was imposed properly" is consistent with federal law.  California Court of Appeals's Decision at p. 20.

## CONCLUSION

This Court finds that the California Court of Appeals's decision affirming Petitioner's conviction and sentence did not involve an unreasonable application

//

---

[14]With respect to the parolee at large sentence enhancing factor, Petitioner stipulated to the fact that he was a parolee at large with a warrant out for his arrest when this incident occurred.  Reporter's Transcript on Appeal at p. 485.  The Supreme Court's decision in *Blakely* authorizes trial courts to enhance a defendant's sentence on account of facts admitted by him. *See Blakely*, 542 U.S. at 303.  Accordingly, the fact that the parolee at large sentencing factor was not submitted to the jury is immaterial.

of clearly established federal law.  Habeas relief is not warranted and the Court **DENIES the Amended Petition and DISMISSES it with prejudice.**

IT IS SO ORDERED.

DATED:   October 22, 2009

By _____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE